IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

JOYCE JESTER,

    Plaintiff,

      v.

MICHAEL J. ASTRUE,
Commissioner of Social Security,

    Defendant.

CIVIL ACTION FILE

NO. 3:06-CV-0073-GGB

## FINAL ORDER

Joyce Jester brings this action pursuant to the Social Security Act, 42 U.S.C. §§ 405(g), 1383(c)(3), to obtain judicial review of the final decision of the Commissioner of Social Security denying her application for Supplemental Security Income ("SSI"). Jester claims that she can no longer work primarily due to mental problems. On December 8, 2005, a hearing was held before an Administrative Law Judge ("ALJ"), who issued an opinion denying Jester's claim for benefits on March 2, 2006. (R. 12-19). Thereafter, the Appeals Council denied Jester's request for review, making the ALJ's decision the final decision of the Commissioner. Jester has exhausted her administrative remedies, and this case is ripe for judicial review.

I.    **FACTS**

    A.    Age, education, and work experience

Jester was 39 years old when the ALJ's decision was issued.  She has an 11th grade education and later obtained training as a nursing assistant.  She has worked as a cashier, hand packager, nurse's aide, and house worker/domestic.

    B.    Testimony from Jester and her sister

Jester testified at the administrative hearing that she had been seeing a psychiatrist, Dr. Rao, for anxiety and mental health problems.  Jester stated that she feels as if something is after her and that she becomes frightened when out in public.  For this reason, she no longer goes out by herself, although she can walk to the mailbox.  Jester also stated that she does not go to church because she cannot deal with the people and the noise, and that she no longer drives due to a fear of traffic.  Jester fills her days by reading and watching television; she also cooks occasionally.  She has two friends who read the Bible to her.

With respect to her mood, Jester testified that she has some good days, but on other days, she feels as if her condition is getting worse.  Finally, Jester testified that she cries often and that she obtains medication for her anger from Dr. Rao.  (R. 27-39).

2

Jester's sister, Darlene Hamm, testified that she sees her sister often and takes her to the store.  She stated that Jester gets agitated and has anxiety attacks, and while in  stores, does not want to be around a lot of people.  According to Hamm, Jester sometimes does not want to attend family gatherings.  Jester occasionally goes to church, but she does not always sit through the service.  If things take too long she gets upset.  (R. 46-50).

C.     Medical Evidence

Between February 22, 2001 and June 14, 2005, Jester sought treatment at the Spalding Regional Medical Center emergency room on numerous occasions.  Her complaints included chest pain, reflux, anxiety, neck pain, hypertension, abdominal pain, dizziness, pelvic pain, back pain, depression, foot pain, and headaches.  On August 5, 2003, November 20, 2003, and August 24, 2004, CT examinations of Jester's head were performed.  The results of these examinations, as well as chest x-rays taken on January 19, 2005, were normal.

From October 1, 2001 through November 1, 2005, Jester was treated by psychiatrist Kusuma S. Rao, M.D.  Dr. Rao initially diagnosed Jester as suffering from panic attacks with agoraphobia.  The doctor noted that Jester's judgment was fair to

poor; her insight was fair; her speech was "less than normal"; and her mood was anxious, depressed, irritable, and fearful. (R. 217). Jester reported problems with anxiety and insomnia. During her visit in December 2001, Jester complained of anxiety, panic attacks, and depression. Dr. Rao noted that Jester was not getting better. (R. 215).

Jester continued to see Dr. Rao throughout 2002. At times, Dr. Rao described her mood as cheerful, and at other times, as angry or anxious. (R. 209-15). Unfortunately, the majority of Dr. Rao's treatment notes covering this period of time are illegible. (See id.).

After a visit on January 2, 2003, Dr. Rao concluded that Jester was stable and that she was not then experiencing any stressful situations. In February 2003, Dr. Rao noted that Jester questioned "her ability to continue like this" and did "not approve of her situation since she was able to be a productive citizen before the panic attacks started." Jester reported that she was unable engage in more activity than a brief visit to the grocery store without suffering panic attacks. In March 2003, Jester was anxious and angry and thought that she had been ignored by the hospital emergency room. Dr. Rao strongly recommended that Jester attempt "to make progress for future work situation or vocational rehabilitation." (R. 206). In May 2003, Dr. Rao found Jester

4

to be cheerful and noted that she was able to make logical connections with society without fear.  On September 9, 2003, Dr. Rao indicated that Jester was experiencing severe panic attacks and paranoia.  (R. 205-08, 342).

Jester was examined by consulting psychologist R.A. Maierhofer, Ph.D., on January 8, 2002, and again on July 17, 2003.  In the first examination, Dr. Maierhofer noted that Jester was subdued, withdrawn, and "quite lethargic."   She exhibited apprehension; her thought content was "quite limited"; and her orientation skills were "rather weak."  (R. 198-200).  Dr. Maierhofer administered an IQ test and measured Jester's verbal IQ at 53, her performance IQ at 54, and her full scale IQ at 49. Dr. Maierhofer stated that these scores would place Jester in the moderately retarded range of intellectual functioning.   However, based on Jester's education and background, Dr. Maierhofer did not believe that these scores reflected her true intelligence level.  He noted that she had missed easy items on the test and had gotten difficult items correct, and he believed that she was likely malingering in order to obtain disability benefits.  Dr. Maierhofer did not believe that Jester was organically impaired and concluded that her cognitive skills were adequate for employment. Nonetheless, Dr. Maierhofer opined that Jester might have trouble handling employment because of her reported anxiety, and that her prognosis was "limited for

AO 72A
(Rev.8/82)

sustained employment." (R. 198-203).

Dr. Maierhofer evaluated Jester again on July 17, 2003, and made observations similar to those made previously. Jester told Dr. Maierhofer that she was seeing a psychiatrist once a month, and when asked how she was doing mentally, Jester responded, "okay, I guess." Regarding daily activities, Jester stated that she cooks, washes dishes, sweeps, does the laundry, dusts, empties the garbage, and does some chores.

Dr. Maierhofer noted that Jester's stream of thought was adequate, that her thought content was relevant, and that she did not exhibit confused thinking. Dr. Maierhofer opined that, although Jester's orientation abilities were weak, her intellectual skills appeared fair. He stated that she showed somewhat limited insight, but had adequate judgment skills and fair concentration abilities. He felt that she would be able to follow work rules and to understand and carry out job instructions. On the other hand, Dr. Maierhofer stated that Jester "could have some trouble dealing with other workers and supervisors as well as handling stress," that her emotional stability was marginal, and that her reliability would be limited. He concluded that Jester was suffering from an anxiety disorder and that her prognosis for "sustained employment" was "guarded." (R. 262-66).

6

A non-examining agency consultant opined in July 2003 that Jester had mild to moderate restrictions in her activities of daily living, moderate difficulties maintaining social functioning, and moderate difficulties maintaining concentration, persistence, or pace. The consultant's report also states that Jester was moderately limited in her ability to understand, remember, and carry out detailed instructions; maintain attention and concentration for extended periods of time; perform activities within a schedule; maintain regular attendance and punctuality; complete a normal workday or week without interruptions from psychologically based symptoms; perform at a consistent pace; interact appropriately with the public; accept instructions and criticisms from supervisors; get along with coworkers; and respond to changes in the work setting. All other functions were not significantly limited. (R. 268-69).

In September and October 2003, Dr. VanderPlate, another non-examining consultant, came to the same conclusions as the previous consultant based upon the same records, except that he claimed that Jester was not significantly limited in her ability to perform activities within a schedule, maintain regular attendance and punctuality, and had no limitations in her ability to get along with co-workers, or to accept instructions and respond appropriately to criticism from supervisors. (R. 293-94).

7

In September 2003, Dr. Rao completed two mental impairment questionnaires on Jester's behalf.  (R. 290-92, 342-48, 366-72).  She noted that Jester suffers from anxiety and racing thoughts, and that her affect and mood are labile.  Dr. Rao checked boxes on the form indicating that Jester has an abnormally low ability to get along with the public, supervisors and co-workers because of her agoraphobia, and that she has a markedly abnormal ability to deal with changes in the work setting because of her very poor tolerance for stress.  The doctor opined that Jester would likely decompensate or become unable to function if placed under stress.  (R. 292, 347).

In the second questionnaire, Dr. Rao expressed her opinion that Jester was not malingering and that she suffers from poor memory; sleep disturbances; emotional lability; recurrent panic attacks; paranoia or inappropriate suspiciousness; blunt, flat or inappropriate affect; intrusive recollection of a traumatic experience; and generalized and persistent anxiety.  She added that Jester lacks the ability to socialize, that her prognosis was "guarded," and that her psychiatric condition exacerbates Jester's experience of pain and other physical symptoms.  (R. 343-45).

With respect to Jester's ability to perform basic work functions, Dr. Rao concluded that Jester's severe panic attacks and paranoia left her with only a "fair" ability to remember work-like procedures, maintain regular attendance and acceptable

punctuality, complete a normal work day or week without interruptions from psychologically based symptoms, perform at a consistent pace, and accept instructions and respond appropriately to criticism from supervisors. "Fair" is defined on the form as "seriously limited to the point that daily production requirements would likely not be met with any consistency." (R. 345-46).

Dr. Rao also concluded that Jester has "poor" or no ability to get along with co-workers without unduly distracting them or exhibiting behavior extremes, to respond appropriately to changes in a routine work setting, to deal with normal work stress, and to be aware of normal hazards and take appropriate precautions. (R. 346). "Poor" is defined on the form as having "[n]o useful ability to function." (R. 345).

More generally, Dr. Rao indicated that Jester's activities of daily living were only slightly restricted and that her ability to maintain social functioning was moderately restricted. Dr. Rao also believed that Jester's deficiencies of concentration, persistence or pace would prevent her from completing tasks in a timely manner on a daily basis, and that she would experience daily "episodes of deterioration or decompensation in competitive work or work-like settings," resulting in withdrawal from the situation. (R. 347). Finally, Dr. Rao concluded that Jester's impairments would cause her to miss work more than three days per month. (R. 348).

Dr. Rao's June 2004 treatment notes state that Jester had gained a significant amount of weight and that she had admitted to binge eating and anorexia.  In August and September, Jester complained about breathing problems but resisted going to a specialist for a consultation.  In November, Jester was doing well, free from chronic sinusitis.  (R. 361-64).

In January 2005, Dr. Rao noted that Jester was cheerful following a "well satisfied holiday season"; however, in March, Jester was clearly showing symptoms of "schizo uniform personality disorder for which there may not be much changes available."  (R. 357).  In June, Jester had no complaints.  (R. 354).  In July, she reported a failed attempt to work for a cleaning service, saying that pain in her ankle and knee joint did not allow her to stand for long periods of time.  (R. 353).

On August 5, 2005, Dr. Rao noted that Jester was suffering an "extreme degree of devastation" due to her inability to pay her utility bills, resulting in discontinuation of those services.  Dr. Rao emphasized that Jester needed to contact DEFAC and to let that agency know that she "is unqualified to go for any job especially after a job last week has failed for her to stay in a room because of the extreme degree of panic attacks."  Jester appeared to have lost interest in communicating with the outside world due to her failed attempts at self-management.  (R. 352).  On August 26, 2005, Dr. Rao

10

believed that Jester's repeated inability to retain a job of "any kind" due to her panic attacks had increased her depression, whereas anger and agitation had previously been the problem.  (R. 351).

In October 2005, Jester complained of an increased number of panic attacks even though she had not been exposed to any additional stress.  She had moved in with her sister because of her fear of staying at home by herself.  Dr. Rao recommended that Jester be hospitalized for an evaluation, but Jester declined due to her parental responsibilities.  (R. 350).

In November 2005, Jester was again upset because her utilities had been shut off.  She was "extremely devastated by the fact that she [had] not [been] awarded any kind of benefits," even though she had made several unsuccessful attempts to hold a job, resulting in "negative income for herself."  (R. 349).  That same month, Dr. Rao indicated that her opinion of Jester's functional abilities had not changed since September 2003, when Dr. Rao completed the mental impairment questionnaires.  (R. 366).

D.    Testimony from the vocational expert

A  vocational  expert  ("VE")  also  testified  at  the  administrative  hearing,

11

answering several hypothetical questions pose by the ALJ.  For purposes of these hypotheticals, the ALJ defined the term "moderately limited" as affecting, but not precluding, the ability to function, and "poor" as seriously limiting the ability to function, but not completely precluding it.

The VE testified that a hypothetical individual of Jester's age, education, and past relevant work experience (with no exertional or postural limitations) could perform Jester's past relevant work even if she had only a moderate ability to handle work-related stresses and a moderately limited ability to concentrate, pay attention, and interact with people.  When the hypothetical was modified to describe Jester's ability to interact with the public, co-workers, and supervisors as poor, the VE testified that such an individual would be able to perform the job of hand packager, but could not perform any of Jester's other past relevant jobs.

When asked whether a similar individual with only a poor ability to maintain attention and concentration; deal with work-related stress; interact with the general public, supervisors, and co-workers; meet a regular work schedule, and maintain regular attendance due to the effects of medication and psychological symptoms, could do her past work, the VE again responded that she could still work as a hand packager.  According to the VE, the position of hand packager is an unskilled, quota-based

AO 72A
(Rev.8/82)

position, which provides a reasonable tolerance for unscheduled absences of up to three per month, and that the position involves "very routine [and] simple tasks," resulting in low levels of stress.  Finally, the VE testified that a person with all of these limitations who had no ability to interact with co-workers or supervisors would not be able to perform any job.  (R. 41-45).

     E.    <u>The ALJ's Decision</u>

The ALJ found that Jester's anxiety disorder, organic mental disorder, acid reflux disease, and hypertension were severe impairments, but that her statements about her symptoms were not entirely credible.  The ALJ further found that Jester had the following residual functional capacity: no exertional or postural limitations; moderately limited ability to handle work-related stress; inability to perform anything other than simple tasks; moderately limited attention and concentration; and poor ability to interact with co-workers, supervisors, and the general public.  Nonetheless, he found that Jester could perform her past relevant work as a hand packager.  (R. 14-19).

AO 72A
(Rev.8/82)

## II.    DEFINITION OF "DISABILITY" AND BURDEN OF PROOF

An individual is considered disabled for purposes of disability benefits if she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The impairment or impairments must result from anatomical, psychological, or physiological abnormalities which are demonstrable by medically accepted clinical or laboratory diagnostic techniques and must be of such severity that the claimant is not only unable to do her previous work, but cannot, considering age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy.    42 U.S.C. § 423(d)(2),(3).

The burden of proof in a disability case is divided between the claimant and the Commissioner. The claimant bears the initial burden of establishing the existence of a disabling condition by demonstrating that she is unable to perform her former type of work. Boyd v. Heckler, 704 F.2d 1207, 1209 (11th Cir. 1983). Once the claimant has met this burden, the burden of production shifts to the Commissioner to show that, considering the claimant's age, education, work experience, and impairment, other jobs

exist in the national economy that the claimant can perform.  See Boyd, 704 F.2d at 1209.  The overall burden of persuasion, however, remains with the claimant to prove that she is unable to perform any of the jobs suggested by the Commissioner.  See id.

## III.   STANDARD OF REVIEW

In reviewing the Commissioner's decision, this Court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner. Barnes v. Sullivan, 932 F.2d 1356, 1358 (11th Cir. 1991).  This Court's only role is to determine whether the Commissioner applied the proper legal standards and whether substantial evidence exists in the record to support the Commissioner's findings. Walden v. Schweiker, 672 F.2d 835 (11th Cir. 1982); 42 U.S.C. § 405(g).  "Substantial evidence" means such "relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  MacGregor v. Bowen, 786 F.2d 1050, 1053 (11th Cir. 1986); Richardson v. Perales, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971).  It may be present even if a preponderance of the evidence weighs in favor of the plaintiff.  Barnes, 932 F.2d at 1358.

In contrast to the Commissioner's findings of fact, no presumption of validity attaches to the Commissioner's application of the law.  Lamb v. Bowen, 847 F.2d 698,

15

701 (11th Cir. 1988).  "A determination that is supported by substantial evidence may be meaningless . . . if it is coupled with or derived from faulty legal principles."  Boyd, 704 F.2d at 1209.

## IV.    DISCUSSION

A.    The ALJ did not articulate a sufficient basis for rejecting the opinions of Jester's treating physician

The ALJ "discounted" and gave "little weight" to the September 9 and 29, 2003 opinions of Jester's treating physician, Dr. Rao.  (R. 18).  Under the Commissioner's rules and regulations, the medical opinion of a treating physician "*must* be given controlling weight, *i.e.*, it must be adopted" if it is "well-supported and not inconsistent with the other substantial evidence in the case record."  Social Security Ruling ("SSR") 96-2P, 1996 WL 374188 (July 2, 1996), *1; accord 20 C.F.R. § 404.1527(d)(2).  The Court of Appeals for the Eleventh Circuit has repeatedly stated that the opinion of a treating physician "must be given substantial or considerable weight unless 'good cause' is shown to the contrary."  Phillips v. Barnhart, 357 F.3d 1232, 1240 (11th Cir. 2003) (citing Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir. 1997)); see also Lamb v. Bowen, 847 F.2d 698, 703 (11th Cir. 1988); Walker v. Bowen, 826 F.2d 996, 1000

16

(11th Cir. 1987); <u>Sharfarz v. Bowen</u>, 825 F.2d 278, 279-80 (11th Cir. 1987); <u>Schnorr v. Bowen</u>, 816 F.2d 578, 581 (11th Cir. 1987); <u>McSwain v. Bowen</u>, 814 F.2d 617, 619 (11th Cir. 1987); <u>MacGregor</u>, 786 F.2d at 1053.

In the case of a mental impairment, statements from a treating physician about a claimant's ability to understand, carry out and remember instructions, and to respond appropriately to supervision, co-workers and work pressures are medical opinions. 20 C.F.R. § 416.913(b)(6),(c)(2). Furthermore, the medical opinions of treating physicians are particularly valuable where, as here, the treatment period has extended over a considerable period of time. <u>Chester v. Bowen</u>, 792 F.2d 129, 131 (11th Cir. 1986); <u>Broughton v. Heckler</u>, 776 F.2d 960, 962 (11th Cir. 1985). Treating physicians are "'likely to be the medical professionals most able to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations.'" <u>Lewis v. Callahan</u>, 125 F.3d 1436, 1440 (11th Cir. 1997)(quoting 20 C.F.R. § 404.1527(d)(2)). For these reasons, the frequency, nature, and extent of the treatment relationship are factors that must be considered when a medical opinion is evaluated by the Commissioner. 20 C.F.R.

§ 404.1527(d)(2).

Good cause for rejecting an opinion of a treating physician exists when (1) the opinion is not bolstered by the evidence, (2) the evidence supports a contrary finding, or (3) the opinion is conclusory or inconsistent with the doctor's own medical records. Phillips, 357 F.3d at 1240; see also Edwards v. Sullivan, 937 F.2d 580, 583 (11th Cir. 1991); Sryock v. Heckler, 764 F.2d 834, 835 (11th Cir. 1985). To ensure that proper weight is accorded the opinion of a treating physician, the Commissioner must provide "explicit and adequate" reasons for rejecting that opinion. Elam v. Railroad Retirement Board, 921 F.2d 1210, 1215 (11th Cir. 1991);[1] see also Phillips, 357 F.3d at 1240 (requiring the ALJ to "clearly articulate its reasons" "[w]hen electing to disregard the opinion of a treating physician"); MacGregor, 786 F.2d at 1053. "Where the [Commissioner] has ignored or failed properly to refute a treating physician's testimony, we hold as a matter of law that he has accepted it as true." Id. at 1053.

Here, the ALJ's opinion does not clearly articulate why he discounted Dr. Rao's opinions. (See R. 15-18). He refers to Dr. Maierhofer's July 17, 2003 report and

---

[1]The Eleventh Circuit noted in Elam that the "provisions of the Railroad Retirement Act are so closely analogous to those of the Social Security Act that regulations interpreting the latter are applicable to the former." Elam, 921 F.2d at 1213.

states, in reference to the questionnaires completed by Dr. Rao, that "the evidence indicates that the claimant's mental limitations are less than disabling." (R. 17-18). The Commissioner argues that the ALJ discounted Dr. Rao's opinions because they are not supported by her treatment notes, nor by other medical evidence, including Dr. Maierhofer's report indicating that Jester was malingering. (Doc. 12 at 7). The Commissioner also argues that Dr. Rao's opinions are inconsistent with the functional ratings provided by the doctor, which suggest only moderate impairment. (Doc. 12 at 8).

1.   Treatment Notes

In describing Dr. Rao's treatment notes, the ALJ opined that "Dr. Rao's impressions varied with the claimant's mood on a given day"; at times Dr. Rao described her as "cheerful" and at other times as "angry or anxious." (R. 15). The ALJ also referred to Dr. Rao's January 2, 2003 notation that Jester was "stable with no stressful situations around her" and her statement on May 2, 2003, that Jester was able to make logical connections with society without fear. (R. 15). The Commissioner's brief notes that, "on many occasions [Dr. Rao] reported that plaintiff had a cheerful affect and mood and was doing well and was stable," that "Dr. Rao tried to discourage

19

plaintiff from calling an ambulance to take her to the emergency room for anxiety," and that the doctor "encouraged vocational rehabilitation and work activity." (Doc. 12 at 5,6).[2]

These notations do not provide a sufficient basis for discrediting Dr. Rao's opinions. Some of the noted comments do not directly concern Jester's work-related abilities. Moreover, the legible portions of Dr. Rao's notes (spanning four years of treatment) show, at most, that Jester had occasional improvements in her mental condition followed by regressions, and that the doctor recommended, on one occasion, that Jester actively pursue vocational rehabilitation. Notes of occasional ups and downs in the symptoms of a mental impairment over a long period of treatment do not demonstrate that a doctor's opinions about the patient's limitations are suspect. See Dreste v. Heckler, 741 F.2d 224, 226 n.2 (8th Cir. 1984)(noting that periods of remission are inherent in mental illness and that such remissions do not mean that the disability has ceased); Wallace v. Barnhart, 256 F.Supp.2d 1360, 1376 (S.D.Fla. 2003) ("Symptom-free intervals, though sometimes indicative of a remission in the mental

_____

[2]Unfortunately, the Commissioner cites to all treatment notes in the record to support its argument, rather than particular pages, which makes it difficult for the Court to locate the specific notes upon which the Commissioner relies for these observations. (See Doc. 12 at 5,6).

disorder, are generally of uncertain duration and marked by an impending possibility of relapse.  Realistically, a person with a mental impairment may be unable to engage in competitive employment, as his ability to work may be sporadically interrupted by unforeseeable mental setbacks.")(quoting Singletary v. Bowen, 798 F.2d 818, 821 (5th Cir. 2003), quoting Lebus v. Harris 526 F.Supp. 56, 61 (N.D.Cal. 1981)).

In addition, Dr. Rao's note recommending "progress for future work situation or vocational rehabilitation" indicates only that Dr. Rao believed that Jester *might* be able to return to work *in the future*, not that she could return to work at that time.  In other words, the fact that  Dr. Rao had a goal or treatment plan that included rehabilitation and employment for Jester does not contradict Dr. Rao's opinions regarding Jester's limitations.  See Cox v. Califano, 587 F.2d 988, 991 (9th Cir. 1978) ("A willingness to try to engage in rehabilitative activity and a release by one's doctor to engage in such an attempt is clearly not probative of a present ability to engage in such activity.").

The ALJ also appears to have relied on Dr. Rao's opinion that Jester retained the ability, within moderation, to perform work-related functions, such as Jester's ability to understand, remember, and carry out very simple instructions.  (See R. 17).  The fact that Jester could perform *some* work-related functions with relative competence,

21

however, does not demonstrate that she is capable of retaining a job.  The ALJ, for example, does not provide any specific explanation for his rejection of Dr. Rao's opinions regarding Jester's poor ability to get along with the public, supervisors and co-workers, or her markedly poor ability to deal with changes in the work setting due to stress intolerance.  Indeed, the doctor believed that Jester would likely decompensate or become unable to function under the stress of a job, (see R. 292, 346-47), which, if true, would almost certainly preclude employment regardless of Jester's ability (when not under stress) to carry out simple instructions.  Nothing in the ALJ's opinion adequately explains why he discredited Dr. Rao's opinions regarding Jester's ability to deal with stress.

2.    Dr. Maierhofer and the non-examining consultants

The ALJ also relied upon Dr. Maierhofer's opinions, including his opinion that Jester was likely malingering.  Dr. Maierhofer, however, opined that Jester was malingering on an intelligence test given during the first evaluation.  Jester is not relying on low intelligence to support her claim.  Furthermore, notwithstanding Dr. Maierhofer's opinion regarding Jester's motivation with respect to the intelligence test, he found significant limitations in Jester's ability to function in a work setting due

22

to her anxiety and emotional instability.  (R. 203, 266).

Furthermore, in Dr. Maierhofer's second report, he acknowledged that Jester "would have some trouble dealing with other workers and supervisors as well as handling stress."  He described her emotional stability as "marginal" and her reliability on a job as "limited."  In this report, Dr. Maierhofer said nothing about the possibility of malingering, but rather diagnosed an anxiety disorder and concluded that Jester's prognosis for sustained employment was "guarded."  (R. 266).  "Guarded" is a prognosis given by a physician when the outcome of a patient's illness is in doubt. *Tabers Cyclopedic Medical Dictionary* (2002)(available on Lexis).

The Commissioner may not discount a treating doctor's opinion where medical evidence does not *conclusively* counter that opinion and no other good cause is shown. See Schnorr v. Bowen, 816 F.2d 578, 581 (11th Cir.1987).  To be considered "not inconsistent" with the record as a whole, a treating physician's medical opinion "need not be supported directly by all of the other evidence (i.e., it does not have to be consistent with all the other evidence) as long as there is no other substantial evidence in the case record that contradicts or conflicts with the opinion."  SSR 96-2P, 1996 WL 374188, *3.  The descriptions given by Dr. Maierhofer of  Jester's work-related abilities are not identical to those given by Dr. Rao; nonetheless, they do not contradict

23

Dr. Rao's opinions.  Both doctors found serious limitations in Jester's work-related functions due to an anxiety disorder, and both were fairly consistent in their prognoses. The differences between Dr. Maierhofer's wording and Dr. Rao's wording are not sufficient to conclusively counter Dr. Rao's opinion.  In other words, the two doctors' opinions are "not inconsistent."

The ALJ also relied to some degree on the opinions of non-examining consultants.  "The opinions of nonexamining, reviewing physicians, . . . when contrary to those of the examining physicians, are entitled to little weight, and standing alone do not constitute substantial evidence."  Sharfarz v. Bowen, 825 F.2d 278, 280 (11th Cir. 1987); accord Spencer on behalf of Spencer v. Heckler, 765 F.2d 1090, 1094 (11th Cir. 1985)("'[t]o attempt to evaluate disability without personal examination of the individual and without evaluation of the disability as it relates to the particular person is medical sophistry at best'"); see also Lamb v. Bowen, 847 F.2d 698, 703 (11th Cir. 1988); but cf. Edwards v. Sullivan, 937 F.2d 580, 584-85 (11th Cir. 1991)(finding that the ALJ did not err in relying on the opinion of a non-examining physician where the physician's opinion was consistent with the opinions of examining physicians).

AO 72A
(Rev.8/82)

3.     Functional Ratings

Finally, the Commissioner argues that Dr. Rao's observations were internally inconsistent in that her "functional ratings" suggested only moderate impairments. (Doc. 12 at 8).  The Commissioner states that Dr. Rao appeared to give Jester a GAF (Global Assessment of Functioning)[3] score of 60 in October 2001, which indicates only a moderate difficulty in social, occupational, or school functioning.  (Doc. 12 at 6). Although the Court cannot locate any GAF score in the record, Jester appears to acknowledge that she had GAF scores of 55 and 60.  (See Doc. 13 at 3).  In any event, the ALJ did not mention the GAF scores, and this Court may not rely on *post hoc* explanations to affirm an ALJ's opinion.  See Owens v. Heckler, 748 F.2d 1511, 1516 (11th Cir. 1984).

_____

[3]A GAF score is a subjective determination which represents "the clinician's judgment of the individual's overall level of functioning."  American Psychiatric Assoc., Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV"), p. 30 (4th ed. 1994).  The GAF score is taken from the GAF scale which "is to be rated with respect only to psychological, social, and occupational functioning."  Id.  The GAF scale ranges from 100 (superior functioning) to 1 (persistent danger of severely hurting self or others, persistent inability to maintain minimal personal hygiene, or serious suicidal act with clear expectation of death).  Id. at 32.   A GAF score between 41 and 50 indicates that the individual has a serious impairment in social, occupational, or school functioning.  Id.  A score between 51 and 60 indicates moderate difficulty in one or more of these areas.  Id.  And a GAF score between 61 and 70 represents mild symptoms or mild difficulty in social, occupational, or school functioning.  Id.

25

For the above reasons, the Court finds that the reasons given by the ALJ for giving little weight to Dr. Rao's medical opinions are not supported by substantial evidence.

B.      Jester's other arguments

Jester also argues that the ALJ did not adequately explain how he arrived at Jester's mental residual functional capacity ("RFC").   Because this case is being remanded for a new analysis of Jester's mental residual functional capacity, with proper weight being given to the opinions of her treating physician, the mental RFC given by the ALJ may change.   Accordingly, the Court need not further address the adequacy of the ALJ's current explanation of Jester's mental RFC.

Next, Jester argues that the ALJ did not adequately resolve conflicts between the VE's testimony and the Dictionary of Occupational Titles ("DOT").   Jester states: (1) that the ALJ restricted her to "simple" work, yet the DOT describes the job of hand packager as requiring the ability to carry out "detailed" (but uninvolved) instructions, (Doc. 10, Ex. 2); and (2) that the hand packager job, as described in the DOT, has requirements which produce stress, yet the ALJ did not find that Jester was capable of dealing with the types of stresses inherent in that job.

Social Security Ruling 00-4P clarifies the standards for identifying and resolving conflicts between information set forth in the DOT and evidence provided by a VE. The Ruling states:

> Occupational evidence provided by a VE or VS generally should be consistent with the occupational information supplied by the DOT.  When there is an apparent unresolved conflict between VE or VS evidence and the DOT, the adjudicator must elicit a reasonable explanation for the conflict before relying on the VE or VS evidence to support a determination or decision about whether the claimant is disabled.  At the hearings level, as part of the adjudicator's duty to fully develop the record, the adjudicator will inquire, on the record, as to whether or not there is such consistency.

> Neither the DOT nor the VE or VS evidence automatically "trumps" when there is a conflict.  The adjudicator must resolve the conflict by determining if the explanation given by the VE or VS is reasonable and provides a basis for relying on the VE or VS testimony rather than on the DOT information.

2000 WL 1898704, *2.  Also relevant to Jester's second point is Social Security Ruling 82-62, which states:

> *Detailed information about* strength, endurance, manipulative ability, *mental demands* and other job requirements *must be obtained as appropriate*.  This information will be derived from a detailed description of the work obtained from the claimant, employer, or other informed source. . . . In addition, *for a claim involving a mental/emotional impairment, care must be taken to obtain*

27

> *a precise description of the particular job duties which are*
> *likely to produce tension and anxiety, e.g., speed, precision,*
> *complexity of tasks, independent judgments, working with*
> *other people, etc.,* in order to determine if the claimant's
> mental impairment is compatible with the performance of
> such work.

SSR 82-62, 1982 WL 31386, *3 (emphasis added).

On remand, the ALJ should address the points raised by Jester and resolve any conflicts between the DOT and the VE's testimony. <u>Cf</u>. <u>Henrie v. U.S. Dept. of Health & Human Servs.</u>, 13 F.3d 359, 361 (10th Cir. 1993)(finding that the requirements of SSR 82-62 had not been met where the record was "devoid of evidence" regarding the stress of the claimant's prior job and "explicit references in the record to the claimant's inability to handle stress . . . suggested a need to probe the stress level of any prior job").

Finally, Jester argues that the ALJ did not adequately explain how Jester could work notwithstanding his finding that she had "poor" (which he defined as severely limited) ability to interact with co-workers and supervisors.  Jester points out that responding appropriately to supervision and co-workers is a basic work activity.  (<u>See</u> Doc. 10 at 28-9, quoting SSR 85-15).  On remand, the ALJ should discuss and resolve this apparent conflict between Jester's poor, *i.e.,* "severely limited," ability to interact

28

with co-workers and supervisors, and the requirement of basic work activity.

C.    Appropriate Relief

In Social Security cases, the role of this Court is to determine whether the law has been properly applied and whether substantial evidence supports the Commissioner's findings; it is not to find facts. Because of this limited role, when errors occur, the general rule is to reverse and remand for additional proceedings. See, e.g., Davis v. Shalala, 985 F.2d 528, 534 (11th Cir. 1993)(referring to general practice); Holt v. Sullivan, 921 F.2d 1221, 1223-24 (11th Cir. 1991). "This court, however, may . . . remand the case for an . . . award [of] disability benefits where . . . it is clear that the cumulative effect of the evidence establishes disability without any doubt." Davis, 985 F.2d at 534; see also Bowen v. Heckler, 748 F.2d 629, 636 (11th Cir. 1984)("Where the [Commissioner's] determination is in clear disregard of the overwhelming weight of the evidence, Congress has empowered the courts to modify or reverse the [Commissioner's] decision with or without remanding the case for a rehearing.").

The opinions of Dr. Rao, discussed above, make it likely that benefits should be awarded on remand. However, because Dr. Rao's treatment notes are important to the

29

outcome of this case and many of them are illegible, (see R. 209-16), the Court cannot conclude that a finding of disability is inevitable.  On remand the ALJ may choose to decipher all of the notes and/or consider the impact of the GAF scores, which the ALJ did not previously discuss.


**IV**.   **CONCLUSION**

For the foregoing reasons, the undersigned orders that the Commissioner's final decision denying Plaintiff Joyce Jester's application for Supplemental Security Income be **REVERSED** and that this action be **REMANDED** to the Commissioner for further proceedings consistent with this opinion.

Plaintiff's attorney is authorized to seek this Court's approval of attorney's fees under the Social Security Act if benefits are awarded on remand, provided the motion is filed within 30 days after counsel is served with notice of the amount of past-due benefits.

IT IS SO ORDERED, this 27th day of July, 2007.


*Gerrilyn G. Brill*
GERRILYN G. BRILL
UNITED STATES MAGISTRATE JUDGE

T:\FINAL.SS\Jester.wpd

30